# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

LEONARD MIXON,                          )       CASE NO. 1:13-CV-173
                                        )
            Plaintiff,                  )
                                        )       MAGISTRATE JUDGE
      v.                                )       VECCHIARELLI
                                        )
CAROLYN W. COLVIN,                      )
      Acting Commissioner of Social     )
      Security,                         )       **MEMORANDUM OPINION AND**
                                        )       **ORDER**
            Defendant.                  )

Plaintiff, Leonard Mixon ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"),[1] denying

his applications for Supplemental Security Income ("SSI") under Title XVI of the Social

Security Act ("Act"), 42 U.S.C. §§ 423 and 1381(a), and for Period of Disability ("POD")

and Disability Insurance Benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 416(i),

423.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the

undersigned United States Magistrate Judge pursuant to the consent of the parties

entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below,

the Commissioner's final decision is AFFIRMED.

## I.   PROCEDURAL HISTORY

On September 8, 2009, Plaintiff filed his applications for SSI, POD and DIB, and

alleged a disability onset date of July 14, 2009.  (Transcript ("Tr.") 10.)  The application

---

[1]     On February 14, 2013, Carolyn W. Colvin became Acting Commissioner
of Social Security.  She is automatically substituted as the defendant in
this case pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

was denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ"). (*Id.*) On August 5, 2011, an ALJ held Plaintiff's hearing. (*Id.*) Plaintiff participated in the hearing, was represented by counsel, and testified. (*Id*) A vocational expert ("VE") also participated and testified. (*Id.*) On August 23, 2011, the ALJ found Plaintiff not disabled. (Tr. 17.) On November 23, 2012, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 1.)

On January 24, 2013, Plaintiff filed his complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 15, 16.)

Plaintiff argues that the ALJ erred in: (1) failing to assign restrictions to accommodate Plaintiff's personality disorder despite determining that the disorder was severe; (2) improperly assessing Plaintiff's credibility; and (3) failing to consider evidence in the record that supported Plaintiff's claim of disability.

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Plaintiff was born on July 2, 1954, and was 57 years old at the time of his administrative hearing. (Tr. 27.) He completed the twelfth grade. (*Id.*) Plaintiff had past relevant work as a mail clerk and a tow motor operator. (Tr. 16.)

### B.   Medical Evidence

#### 1.   Plaintiff's Providers

On June 15, 2009, Plaintiff presented to the emergency department at Miami

Valley Hospital ("Miami Valley"), complaining of chest pain and shortness of breath. (Tr. 190-91.)  A stress test was negative for reversible ischemia, and Plaintiff's ejection fraction was calculated at 40%.[2]  (Tr. 190.)  Physicians diagnosed Plaintiff with atypical chest pain, opining that it was likely due to stress.  (*Id*.)  Plaintiff stated that he smoked at least a pack of cigarettes each day.  (Tr. 200.)  A chest x-ray revealed bilateral large bullae, and could not entirely exclude a possible pneumothorax.[3]  (Tr. 209.)  A second chest x-ray revealed bullous paraspetal type emphysema.  (Tr. 210.)  An emergency room physician prescribed Ativan and discharged Plaintiff the next day in good condition. (Tr. 191.)

On June 16, 2009, Plaintiff returned to Miami Valley, complaining of shortness of breath, anxiety and dizziness.  (Tr. 212-13.)  After an EKG and a chext x-ray showed no acute processes, an emergency room physician diagnosed Plaintiff with hypertensive urgency and anxiety, prescribed hydrochlorothiazide ("HCTZ"), a blood pressure medication, and discharged Plaintiff.  (Tr. 214-15.)  Plaintiff returned to the emergency department at Miami Valley on July 11, 2009, complaining of headache, lightheadedness and heartburn.  (Tr. 224.)  An emergency room physician diagnosed Plaintiff with hypertension and anxiety, and instructed him to follow up with a family

---

[2]  The ejection fraction is "the proportion of the volume of the blood in the ventricles at the end of the diastole that is ejected during systole . . . .  It is normally 65 +/- 8 percent; lower values indicate ventricular dysfunction."  *Dorland's Illustrated Medical Dictionary* 734 (Saunders, 30th ed. 2003).

[3]  A bulla, of which bullae is the plural form, is a "rounded, projecting, anatomical structure."  *Dorland's Illustrated Medical Dictionary* 259 (Saunders, 30th ed. 2003).  A pneumothorax is "an accumulation of gas in the pleural space."  *Id*. at 1467.

physician. (Tr. 226.) On July 13, 2009, Plaintiff again returned to the emergency department at Miami Valley, complaining of chest pain, shortness of breath and dizziness. (Tr. 231.) After a normal EKG, emergency department staff diagnosed Plaintiff with chest pains and transferred him to the Veteran's Administration ("VA"), which was providing Plaintiff with primary medical care. (Tr. 233.)

On July 14, 2009, a VA physician discharged Plaintiff from the Dayton VA Hospital, noting that Plaintiff's chest pain was likely secondary to his uncontrolled hypertension. (Tr. 252.) The VA physician prescribed HCTZ, Lisinopril, and lorazepam. (Tr. 253.) During his hospitalization, Plaintiff reported using marijuana and cocaine, as recently as March 2009. (Tr. 307, 310.) Later in July 2009, Plaintiff returned to the VA Hospital, complaining of chest pain and shortness of breath. (Tr. 267-68.) A VA physician opined that Plaintiff had cardiomyopathy and prescribed a beta blocker. (Tr. 269.)

In August 2009, Plaintiff established care with Damanjeet Kahlon, M.D., a primary care physician at the VA. (Tr. 357.) He reported smoking one-half pack of cigarettes each day, and that he had quit using cocaine six months prior. (*Id*.) Dr. Kahlon diagnosed Plaintiff with well-controlled cardiomyopathy, and advised him to return for testing in six months, and to quit smoking. (Tr. 358-59.)

In October 2009, a VA physician diagnosed Plaintiff with Hepatitis C. (Tr. 477.) Plaintiff reported to VA staff that he had a history of drug and alcohol use. (*Id*.) Later in October 2009, Plaintiff complained of increased fatigue while walking. (Tr. 463.) A VA cardiologist noted that Plaintiff's pain was an occasional dull ache, accompanied by a racing heart. (Tr. 460.) The cardiologist diagnosed Plaintiff with "presumed NICM

4

[non-ischaemic cardiomyopathy] due to polysubstance abuse" as well as chronic obstructive pulmonary disorder.  (Tr. 461.)  The cardiologist noted Plaintiff's reports of using crack cocaine one to two times each week for ten years, as well as marijuana.  (Tr. 459.)  The physician prescribed an ACE inhibitor and a beta blocker.  (*Id.*)

On March 9, 2010, Plaintiff complained to VA staff of feeling dizzy and lightheaded while riding the bus.  (Tr. 420-21.)  His symptoms resolved after he drank some orange juice, however, and he told the staff that he had dressed too warmly and was likely overheated.  (Tr. 421.)  The record of his visit indicates that he had been diagnosed with "narcotic[-]induced cardiomyopathy."  (*Id.*)

On March 23, 2010, Plaintiff reported no chest pain or tightness, and no new symptoms.  (Tr. 414.)  He stated that he was "[p]acing himself due to chest heaviness with exertion."  (*Id.*)  On March 25, 2010, VA nurse practitioner Julie A. Gee noted that a December 2009 echocardiogram was "essentially normal" and opined that the result of Plaintiff's June 2009 echocardiogram – which reflected an ejection fraction of 40% – were "likely due to ETOH/cocaine."  (Tr. 415.)  Nurse Gee noted that she called Plaintiff "to discuss the results of the echocardiogram and reinforced maintaining good b[lood] p[ressure] control on current medication regimen and abstainence [*sic*] of cigarettes, cocaine and alcohol and heart function should remain normal."  (*Id.*)

On May 3, 2010, Plaintiff reported to the emergency department at South Pointe Hospital ("South Pointe"), complaining of chest pressure, sweating and dizziness.  (Tr. 794.)  A Southe Pointe cardiologist ruled out angina, acute coronary syndrome and decompensated heart failure, and recommended that Plaintiff follow up with the VA.  (Tr. 805.)  On May 5, 2010, Plaintiff followed up at the VA, where he complained of

vertigo.  (Tr. 703.)  A nurse assistant cleaned out Plaintiff's ears, and Plaintiff reported feeling "a little better."  (*Id*.)  He was able to move from sitting to standing, and to walk without difficulty.  (*Id*.)  On May 10, 2010, Plaintiff returned to the VA to follow up on his vertigo.  (Tr. 599-600.)  He reported feeling better, "albeit slowly," and that he took his time making positional changes.  (Tr. 600.)  Plaintiff indicated that he had no cardiovascular symptoms, and had traveled to the appointment by bus.  (*Id*.)  VA staff offered him a straight cane, but Plaintiff declined to wait for it, asking that it be mailed to his home.  (Tr. 601.)  On July 9, 2010, a VA otolaryngologist opined that Plaintiff's lightheadedness was not caused by vestibular issues, but, rather, was likely cardiovascular in nature.  (Tr. 606.)

Plaintiff reported to the South Pointe emergency department on July 19, 2010, complaining of chest discomfort.  (Tr. 801.)  Nitroglycerin relieved Plaintiff's symptoms. (Tr. 802.)  A cardiologist at South Pointe ruled out a myocardial infarction, congestive heart failure and acute coronary syndrome.  (*Id*.)  He instructed Plaintiff to follow up with the VA, and discharged him.  (*Id*.)

On July 30, 2010, Plaintiff returned to the South Pointe emergency department, complaining of chest pressure and lightheadedness while standing and bending over to mop.  (Tr. 775.)  An EKG revealed normal results, and a physical examination revealed no abnormalities.  (Tr. 776.)  Plaintiff was discharged in stable condition.  (*Id*.)  He followed up with the VA on August 3, 2010, where he reported that he felt "fine with no cardiovascular symptoms."  (Tr. 669.)

An August 17, 2010 chest x-ray showed normal heart size and clear lungs, with

6

COPD.  (Tr. 532.)  Nurse Gee noted that Plaintiff had "preserved l[eft] v[entricular] function since he was medicated for [hypertension] and sober."  (Tr. 659.)  She encouraged Plaintiff – who reported smoking one cigarette per day – to stop using tobacco.  (Tr. 660.)

On August 28, 2010, Plaintiff presented at the South Pointe emergency department, reporting chest pain lasting three days.  (Tr. 764.)  His symptoms resolved with Maalox.  (Tr. 765.)  A physician diagnosed Plaintiff with epigastric abdominal pain, and discharged him in stable condition.  (*Id*.)

At a September 1, 2010 VA pulmonary consult, Plaintiff reported left-side lateral chest pain that bothered him most when he was in bed.  (Tr. 570.)  The physician noted that Plaintiff "look[ed] well" and had "no obvious shortness of breath or coughing," with clear lungs and good air entry.  (Tr. 573.)  Testing revealed that Plaintiff's lung volumes were within normal limits, with some signs of small airway disease.  (Tr. 574.)  An echocardiogram revealed preserved ejection fraction, and the physician opined that Plaintiff's pain was not pulmonary in etiology.  (Tr. 575.)  A September 24, 2010 stress test revealed a left ventricular ejection fraction of 54% with normal wall motion and no evidence of reversible ischemia or significant scar.  (Tr. 526.)

On November 1, 2010, Plaintiff complaint to VA Nurse Practitioner Laura Fitzpatrick that he experienced fatigue, palpitations and racing heart on exertion.  (Tr. 621.)  Nurse Fitzpatrick noted that his most recent stress test was with within normal limits.  (*Id*.)  Nurse Fitzpatrick recommended that Plaintiff undergo a sleep study, and avoid spicy, greasy, or fatty foods.  (Tr. 622.)  On November 19, 2010, Plaintiff reiterated his complaints of fatigue with exertion, and requested that Nurse Fitzpatrick

7

complete paperwork related to disability benefits on the basis of his chest discomfort. (Tr. 615-16.)  She explained that Plaintiff would need to consult with a different department to obtain the necessary assessment, and opined that "it does not appear that [Plaintiff] would qualify as fully disabled."  (Tr. 615-16.)  She recommended that Plaintiff consider work programs at the VA.  (Tr. 616.)

On December 17, 2010, Nurse Fitzpatrick noted that Plaintiff had been diagnosed with sleep apnea.  (Tr. 751.)  She reported that he was "[a]gain persistent about getting disability [paperwork] filled out related to his chest discomfort."  (*Id*.) Plaintiff complained that he was unable to perform even simple housework without experiencing chest discomfort or palpitations.  (*Id*.)  Nurse Fitzpatrick noted that Plaintiff's heart had a regular rate and rhythm with no other symptoms and without murmur.  (Tr. 752.)  She noted his "history of substance[-]induced cardiomyopathy." (*Id*.)

On January 5, 2011, Plaintiff underwent a physical medicine rehabilitation consult at the VA.  (Tr. 743.)  Plaintiff reported experiencing lightheadedness, shortness of breath and chest pressure after eight minutes of exercising.  (Tr. 744.)  The VA exercise physiologist opined that Plaintiff was "deconditioned and should make good improvement if he is consistent in coming in [three times] per week."  (Tr. 745.)  On January 10, 2011, Plaintiff was able to tolerate cardiac exercise without experiencing the chest pain and discomfort he had experienced during the first session.  (Tr. 743.) On January 14, 2011, Plaintiff was able to exercise for 30 minutes, and denied any adverse symptoms.  (Tr. 741.)  Plaintiff's exercise time increased to 35 minutes on January 20, 2011. (Tr. 740.)  On January 31, 2011 – after decreasing his exercise time

8

during the prior two sessions – Plaintiff was able to exercise for 30 minutes without symptoms.  (Tr. 735.)  On that same date, Nurse Fitzpatrick noted that Plaintiff reported no recent chest pain or discomfort.  (Tr. 733.)  Plaintiff reported that he had been drug free for over a year.  (*Id*.)  On March 2, 2011, Plaintiff was able to exercise for 25 minutes after having been absent from the exercise program for two and one-half weeks.  (Tr. 728-29.)

### 2.    Agency Reports

On December 5, 2009, agency consulting physician Leigh Thomas, M.D., performed a physical residual functional capacity ("RFC") assessment.  (Tr.370 -77.) She opined that Plaintiff was capable of: lifting 20 pounds occasionally and 10 pounds frequently; standing, walking and/or sitting for six hours in an eight-hour workday; frequently balancing, kneeling, crouching and crawling; occasionally climbing ramps and stairs, and stooping; and never climbing ladders, ropes and scaffolds.  (Tr. 372.)

On December 15, 2009, agency consulting psychologist Herschel Pickholtz, Ph.D., performed a clinical interview and mental status examination.  (Tr. 377-86.) Plaintiff exhibited no aberrant behavior during the examination, and Dr. Pickholtz described Plaintiff's dress, hygiene, motivation and cooperation as average.  (Tr. 381.) Plaintiff's mood and affect were appropriate and normal.  (Tr. 382.)  Dr. Pickholtz did not observe any signs of anxiety, and opined that Plaintiff's anxiety was non-existent. (*Id*.)  Plaintiff reported a history of using crack cocaine since age 20, having been in rehabilitation starting in April 2009.  (Tr. 380.)  Dr. Pickholtz concluded that Plaintiff was mildly impaired in his ability to withstand the stresses and pressures associated with day-to-day work activities, but was not impaired in his ability to follow instructions;

9

maintain attention and perform simple repetitive tasks; and relate to others, including fellow workers and supervisors.  (Tr. 385.)  He diagnosed Plaintiff with cocaine abuse in recent remission, personality disorder relative to addictive features.  (Tr. 385.)

In a December 28, 2009 psychiatric review technique, agency consulting psychologist Douglas Pawlarczyk, Ph.D., diagnosed Plaintiff with personality disorder (not otherwise specified), and cocaine abuse in recent remission.  (Tr. 394, 395.)  Dr. Pawlarczyk opined that Plaintiff was mildly restricted in activities of daily living and maintaining concentration, persistence and pace, but had no limitation in maintaining social functioning.  (Tr. 397.)  On May 12, 2010, agency consulting psychologist Tonnie Hoyle, Psy.D., affirmed Dr. Pawlarczyk's opinion.  (Tr. 501.)

**C.   Hearing Testimony**

**1.   Plaintiff's Hearing Testimony**

At his August 5, 2011 administrative hearing, Plaintiff testified as follows:

He was not able to work because he became dizzy when he exerted himself. (Tr. 28.)  He was working at cardiac rehabilitation in order to increase his stamina, but he was not able to do the things that he could do before.  (Tr. 28-29.)  Plaintiff felt that his illness "wasn't no part of mine," and "nothing done by me, you know it's just an act of God, I guess, I don't know."  (Tr. 29.)

When Plaintiff walked more than two or three minutes, he grew lightheaded and out of breath.  (Tr. 30.)  He felt that he could stand for five or ten minutes at most.  (Tr. 31.)  Plaintiff experienced dizziness, chest pain and lightheadedness when reaching above his head.  (*Id*.)  He lived with his elderly mother.  (Tr. 33.)  He could iron his

clothing but it took some time because he required several breaks while doing so.  (*Id*.)

His sister came over to help with household chores because he experienced chest pain

if he over exerted himself.  (Tr. 33-34.)  Nitroglycerin alleviated the chest pain, but

Plaintiff tried to keep his activities below a level that would induce chest pains.  (Tr. 34.)

In response to questioning from the ALJ, Plaintiff acknowledged that his

diagnosis was substance-induced cardiomyopathy, and stated that he had been drug

free since March 2009.  (Tr. 36.)  The ALJ asked Plaintiff why, in January 2011, Plaintiff

told the VA that he had been drug free for over a year.  (*Id*.)  Plaintiff explained that he

had given that time frame because it was when he had started "drug court," which had

required him to stay sober, and "when I first started that I had to just make up in my

mind that I wasn't going to do drugs anymore."  (Tr. 37.)

### 2.    Vocational Expert's Hearing Testimony

The ALJ described the following hypothetical individual to the VE:

> Assume an individual of [Plaintiff's] age, education and work
> experience who is limited to the light exertional level . . . the
> full . . . range.  Assume an individual additionally that would
> be limited to occasional climbing of ramps and stairs, no
> climbing of ladders, ropes or scaffolds, frequent balancing,
> occasional stooping, frequent kneeling, crouching and
> crawling.

(Tr. 40.)  The VE opined that the hypothetical individual could perform Plaintiff's past

relevant work as a mail clerk.  (*Id*.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he

establihes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of*

11

*Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot,* 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§

12

404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    Plaintiff meets the insured status requirements of the Act through March 31, 2011.

2.    Plaintiff has not engaged in substantial gainful activity since July 14, 2009, the alleged onset date.

3.    Plaintiff has the following severe impairments: a history of substance-induced cardiomyopathy and personality disorder (not otherwise specified).

4.    Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, SubpartP, Appendix 1.

5.    Plaintiff is capable of performing his past relevant work as a mail clerk.  This work does not require the performance of work-related activities precluded by Plaintiff's RFC.

6.    Plaintiff has not been under a disability, as defined in the Act, from July 14, 2009 through August 23, 2011, the date of the ALJ's decision.

(Tr. 12-17.)  Further, although the ALJ did not describe Plaintiff's RFC in a separate finding of fact or conclusion of law, in the body of his decision, he made the following determination:

> [Plaintiff] has the [RFC] to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except he is limited to occasional climbing of ramps and stairs, no climbing of ladders, ropes, or scaffolds; limited to frequent balancing, kneeling, crouching and crawling, and limited to occasional stooping.

(Tr. 14.)

13

### V.    LAW & ANALYSIS

#### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

#### B.    Plaintiff's Assignments of Error

Plaintiff argues that the ALJ erred in: (1) failing to assign restrictions to

14

accommodate Plaintiff's personality disorder despite determining that the disorder was severe; (2) improperly assessing Plaintiff's credibility; and (3) failing to consider favorable evidence in the record.  The Commissioner argues that substantial evidence supports the ALJ's decision in this matter.

> **1.      Personality Disorder**

Plaintiff contends that the ALJ determined that Plaintiff's personality disorder was severe and, thus, that the ALJ erred in failing to include limitations addressing the disorder in Plaintiff's RFC.  Plaintiff's argument, however, arises out of a typographical error in the ALJ's decision and, having no other support in the record, lacks merit.

The ALJ's decision includes the following discussion of Plaintiff's personality disorder:

> On December 12, 2009, [Plaintiff] underwent a psychological consultative evaluation performed by [Dr. Pickholtz].  He reported that he had been in remission for cocaine abuse since March 2009.  Dr. Pickholtz diagnosed cocaine abuse in recent remission and personality disorder NOS related to addictive features.  He also opined that [Plaintiff] has no impairment in the ability to understand and follow directions, maintain attention and concentration to perform simple, routine and repetitive tasks, or relate to others.  He found [Plaintiff] has a mild impairment in the ability to withstand work stress.
>
> On December 28, 2009, a State agency consultant, [Dr. Pawlarczyk], reported that [Plaintiff] had a nonsevere mental impairment.
>
> I find that the opinions of Drs. Pickholtz and Pawlarczyk are entitled to great weight because there is no medical evidence to suggest that [Plaintiff's] medically determinable mental impairment of personality order does not cause more than minimal limitation in [Plaintiff's] ability to perform basic mental work activities.

15

(Tr. 13.)

Plaintiff is correct in arguing that, interpreted strictly as written, the conclusion expressed in the final sentence of the quoted text is that Plaintiff's personality disorder is severe.  This is because the sentence contains two negatives – there is no medical evidence that Plaintiff's personality disorder is not severe – that cancel one another out, resulting in the apparent meaning that Plaintiff's personality disorder is severe.  The ALJ's full discussion of this issue, however, clearly reflects that the ALJ actually concluded that Plaintiff's personality disorder was not severe, and that the ALJ's use of a double negative was a typographical error.  *See* *Demars v. Comm'r of Soc. Sec.*, No. 08-13936-BC, 2009 WL 1803239, *2 (E.D. Mich. June 4, 2009)* ("A typographical error is viewed in the context of the record as a whole.") (citing *Gribbins v. Comm'r of Soc. Sec.*, 37 F. App'x 777, 779 (6th Cir. 2002) (agreeing with the district court that the ALJ's decision contained a typographical error and noting that "[t]he findings and conclusions of the Commissioner are reviewed by this court in the context of the record as a whole").  For example, the ALJ specifically discussed the conclusions of Drs. Pickholtz and Pawlarczyk, each of whom assigned Plaintiff only mild mental limitations.  (Tr. 13.) He assigned great weight to these conclusions.  (*Id*.)  Further, the ALJ himself assigned Plaintiff only mild limitations in activities of daily living and social functioning, and no limitations in concentration, persistence or pace.  (*Id*.)  In sum, the ALJ's discussion of the issue makes it apparent that the ALJ actually concluded that Plaintiff's mental disorder was not severe.  The conclusion that Plaintiff urges is contradictory to the reasoning provided by the ALJ.  *See, e.g., Pope v. Colvin*, No. C12-2157-RAJ, 2013

16

WL 3554010, *5 (W.D. Wash. July 11, 2013) (concluding that "a typographical error . . . which is contrary to the record is not sufficient to warrant reversal of an ALJ's decision").  Accordingly, the ALJ did not err in failing to include mental restrictions in Plaintiff's RFC, and Plaintiff's argument lacks merit.

> ### 2.    Plaintiff's Credibility

Plaintiff argues that, for various reasons, the ALJ improperly assessed his credibility.  Credibility determinations regarding a claimant's subjective complaints rest with the ALJ, are entitled to considerable deference, and should not be discarded lightly.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Villarreal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). However, the ALJ's credibility determinations must be reasonable and based on evidence from the record.  *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007); *Weaver v. Sec'y of Health & Human Servs.*, 722 F.2d 313, 312 (6th Cir. 1983).  The ALJ also must provide an adequate explanation for his credibility determination.  "It is not sufficient to make a conclusory statement 'that an individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" S.S.R. 96-7p, 1996 WL 374186 at *4 (S.S.A.).  Rather, the determination "must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight."  *Id.*

Here, Plaintiff argues that the ALJ erred in finding Plaintiff not credible because

the ALJ: (1) placed undue emphasis on Plaintiff's past drug use; and (2) relied on Nurse

Gee's statement regarding potential progress rather than Plaintiff's actual progress.

Each of these arguments lacks merit.

### a.    Drug Use

With respect to Plaintiff's drug use, the ALJ's decision contains the following

discussion:

> I do not find [Plaintiff's] testimony to be fully credible.  He
> testified repeatedly that he did nothing to cause his illness,
> and it must have been "an act of God."  I then reminded him
> that his diagnosis is *substance induced* cardiomyopathy, and
> he said he has not used illegal drugs since he started drug
> court on March 12, 2009.  I do find the record shows his
> drug abuse stopped in 2009; however, [Plaintiff's] extreme
> allegations are not supported objective medical evidence.

(Tr. 16) (emphasis in original).  Plaintiff argues that the ALJ mischaracterized his

testimony regarding the cause of his medical condition; specifically, he contends that

Plaintiff did not "repeatedly" testify that he did nothing to cause his illness, and that he

was not directly asked whether he believed his actions caused his heart condition.  The

transcript of Plaintiff's testimony, however, reflects that, on two occasions during his

testimony, Plaintiff claimed to have had no part in causing his cardiomyopathy:

> I would much rather be working then to have, even have to
> do it like this but unfortunately I got sick, *it was no part of*
> *mine* and it seems, it seems to me a long process to get
> back to just being a normal person first. . . . I understand . . .
> the criteria that I have to go through to get some help.  And
> you know I understand that but *I just want you to know that*
> *this was nothing done by me, you know it's just an act of*
> *God I guess, I don't know.*

(Tr. 29) (emphasis added).  Plaintiff also contends that he it was reasonable for him to

18

deny that he had any role in his condition, because, at the time of his hearing, Plaintiff

had not used illegal drugs for over two years.  Given, however, that, during his

testimony, Plaintiff acknowledged that he was diagnosed with substance-induced

cardiomyopathy (tr. 36), this argument lacks any support in the record.  Accordingly, the

record supports the ALJ's decision in this respect, and the ALJ did not err in his

credibility determination by relying on Plaintiff's denial that his actions contributed to his

heart condition.

### b.    Reliance on Nurse Gee's Statement

In his decision, the ALJ discussed Nurse Gee's opinion as one basis for

concluding that the objective medical evidence did not support Plaintiff's statements

regarding the severity of his symptoms:

> After careful consideration of the evidence, I find that
> [Plaintiff's] medically determinable impairments could
> reasonably be expected to cause the alleged symptoms;
> however, [Plaintiff's] statements concerning the intensity,
> persistence and limiting effects of these symptoms are not
> credible to the extent they are inconsistent with the above
> [RFC].
>
> *    *    *
>
> A repeat echocardiogram on March 23, 2010, was
> essentially normal on medication therapy.  Nurse practitioner
> Julie Gee . . . talked with [Plaintiff] about maintaining good
> blood pressure control on his current medication regimen,
> and abstinence from cigarettes, cocaine and alcohol.  She
> told him that if he does so, his "heart function should remain
> normal."

(Tr. 15.)  Plaintiff argues that the ALJ erred in relying on Nurse Gee's statement

regarding expected progress rather than Plaintiff's actual progress to determine

whether he was credible.  According to Plaintiff, the ALJ should have relied on evidence

regarding Plaintiff's actual limitations to determine whether he was credible.

Plaintiff's argument lacks merit.  The ALJ reasonably pointed to Nurse Gee's statement as evidence that medical professionals treating Plaintiff did not believe that Plaintiff's condition was as severe as he described during his testimony.  Nurse Gee's opinion that Plaintiff could maintain normal heart function if he complied with his treatment regimen undermined Plaintiff's testimony that he was unable to exert himself at all without experiencing cardiovascular symptoms.  Plaintiff points to no legal authority prohibiting an ALJ from considering a prognosis when determining a claimant's credibility.  Rather, the relevant administrative rulings require an ALJ to consider this type of evidence in this context.  *See* SSR 96-7p, 1996 LW 374186, *5 (July 2,1 996) ("Assessment of the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record.  This includes but is not limited to . . . [d]iagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists or other medical sources.").  Accordingly, the ALJ did not err in relying on Nurse Gee's statement about Plaintiff's prognosis in assessing his credibility.

### 3.    Recent Treatment Records; Favorable Evidence

Plaintiff argues that the ALJ failed to consider evidence that supported Plaintiff's claims of disability.  Specifically, he points to evidence from his cardiac rehabilitation sessions –  which reflect that he was unable to exercise for more than certain durations of time without experiencing cardiovascular symptoms – as well as evidence of other instances in the record when he complained of such symptoms, and of physicians'

opinions that Plaintiff had a cardiovascular impairment.  This argument is not well taken.

Some of the evidence noted by Plaintiff is contained in Exhibit 17F in the administrative transcript, which was not in evidence before the ALJ.  (*See* Tr. 25 ("With no objections I enter into the record 1A through 4A, 1B through 12B, 1D through 8D, 1E through 15E, *and 1F through 16F*.") (emphasis added).)  It is well established that "evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review."  *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (citing *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996) ("[W]here the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify or reverse the ALJ's decision.")).

Further, to the extent that the evidence noted by Plaintiff was before the ALJ, Plaintiff fails to demonstrate that – even in light of this evidence – substantial evidence does not support the ALJ's decision.  As a preliminary matter, it is well established that "[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a part."  *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (citation omitted).  Further, the evidence on which Plaintiff relies generally consists of his own reports regarding his cardiovascular symptoms.  Although he points to evidence that he was diagnosed with a cardiovascular condition, he points to no medical opinion supporting his assertion that

21

his cardiovascular condition rendered him incapable of working.  Accordingly, this argument lacks merit, and substantial evidence in the record supports the ALJ's conclusion that Plaintiff was not disabled.

## VI.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.


**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: August 21, 2013.

22